PETER McKELLAR et al., Appellants, v. MARY McKELLAR HARKINS et al., Appellees.

**BASTARDS:** Proceedings in Bastardy as Evidence. Bastardy rec-
1    ords, including the verdict of guilty and judgment thereon, constitute competent evidence of the paternity of the child in question, and that such proof was made during the lifetime of the putative father, even though the judgment entry does not formally declare the paternity, and even though said judgment has

been set aside, in the sense that all payments for support are terminated.  (Sec. 3385, Code, 1897.)

JUDGMENT: Vacation—Operation and Effect.  The formal vaca-
tion of a judgment, in the sense that all future financial obliga-
tion thereunder is terminated, does not destroy the evidential
value of such judgment, or of the proceedings leading up to and
culminating therein.  So held as to a judgment in bastardy pro-
ceedings.

BASTARDS: Written Recognition—Articles of Adoption.  Recitals
in articles of adoption that the signer is the father of the child
which is given in adoption, that such paternity has been de-
clared by a certain judgment of court, and that said signer "con-
sents" to said adoption, constitute a *written* recognition of the
paternity of said child, within the provisions of Section 3385,
Code, 1897, even though, in the execution of such articles, the
signer was acting under compulsion, in the sense that he was
complying with an order of court as a condition to escaping fur-
ther liability on a bastardy judgment against him, covering the
support of said child.

DESCENT AND DISTRIBUTION: Heirs of Bastard—Putative
Grandfather.  The children of a deceased bastard mother inherit
the share which their mother would have inherited from *her*
father, even though it be conceded that the father, in case he
outlives such children, may not inherit from them.  (Sec. 3385,
Code, 1897.)

DESCENT AND DISTRIBUTION: Adoption of Bastard—Effect on
Inheritance from Natural Parent.  The adoption of an illegiti-
mate child in no wise lessens its right to inherit from its nat-
ural parents.  (Sec. 3384, Code, 1897.)

*Appeal from Clayton District Court.*—A. N. Hobson, Judge.

April 1, 1918.

Rehearing Denied June 24, 1918.

Suit in partition of lands.  The real contest, however, is one of ownership.  All parties claim as heirs of Hugh McKellar, also known in the record as Hugh McKellar, Jr. McKellar died intestate and unmarried, seized of the lands involved herein.  The parties are divided into two contesting groups.  The first group, including the plaintiffs and the

first-named five defendants, comprises the surviving brothers and sisters, and the children of one brother deceased. This group claims the full title by collateral inheritance.

The second group comprises the last five-named defendants. They are the children of Clara Johnson Adams, deceased, the alleged illegitimate child of Hugh McKellar. This group claims the full title by direct inheritance through their mother. There was a decree for the second group. The other parties have all appealed.—*Affirmed.*

*Eugene H. Garnett, D. D. Murphy & Son,* and *Clinton L. Nourse,* for appellants.

*R. E. & V. T. Price,* and *W. W. Davidson,* for appellees.

EVANS, J.—The five defendants referred to in the briefs as the "Adams" defendants are the legitimate children of Clara Johnson Adams. They aver that Clara Johnson Adams was the illegitimate child of Hugh McKellar, and that the paternity was proved in the lifetime of McKellar; and they aver, also, that the paternity was recognized by McKellar in writing. In support of the allegation of paternity and the proof thereof in the lifetime of McKellar, reliance is had upon certain bastardy proceedings had in the circuit court of Clayton County against McKellar, on complaint of Elsa Johnson, wherein trial was had and verdict of guilty rendered, and judgment entered on September 26, 1876. By this judgment, McKellar was adjudged to pay certain installments for the support of the child. Clara Johnson Adams was such bastard child of Elsa Johnson.

In support of the allegation that the paternity was recognized by McKellar in writing, reliance is had upon certain articles of adoption, whereby one Svenson and wife adopted the child, and whereby McKellar, as the purported father thereof, consented to such adoption.

These facts, being found in favor of these defendants by the trial court, became the basis of the decree in their

favor. The allegations here referred to were both denied and avoided by the plaintiffs and the appealing defendants. For them it is contended that McKellar always denied and never admitted the paternity; that the judgment against him in the bastardy proceeding was, at a later date, vacated and rendered wholly nugatory; that, because of such vacation, it is not available to these defendants as evidence that the alleged paternity was proved; that the article of adoption referred to contained no recognition of the paternity by McKellar; that, on the contrary, it implied a denial of such paternity; that, by the adoption, the child Clara became a part of the family tree of her adoptive parents, and her right of inheritance was confined thereto; that, in any event, her heirs could only inherit through her as a part of such family tree; that, even though the child Clara could have inherited from McKellar if she had survived him, yet she predeceased him, and therefore did not inherit from him; that her statutory right to inherit did not carry to her children a right to inherit from McKellar, for want of statutory provision to that effect; that, even though the statute conferred upon her the right to inherit from McKellar, as her putative father, in case of her survival, yet no power of transmitting such right of inheritance through her to her children was conferred by the statute, nor was any relationship created between her legitimate children and McKellar.

It is further urged that there was a want of mutuality, in that, in no event, could McKellar have inherited from the child; and for such reason, a strict construction of the statute should prevail in favor of the legitimate heirs, and against the illegitimate and her heirs. Such is the general nature of the contest. The mere facts are not in dispute. The inferences and conclusions therefrom are in conflict. The contest is argumentative, and in the main pertains to questions of law.

I.   McKellar defended the bastardy proceeding. As a witness, he denied illicit relations with the complainant. The verdict and the judgment went against him. By the judgment, he was ordered to pay $1.00 per week until the first day of the May, 1877, term of the court, "at which time such order for future provision for said child shall be made as shall then seem proper to the court." He was also adjudged to pay the costs. The payments therein ordered were duly made. On May 19, 1877, it was further ordered by the court that McKellar continue to pay $1.00 per week for the support of the child, "until the further order of this court." On January 17, 1879, it was further ordered by the court that the defendant pay $.50 per week, in lieu of $1.00 per week, for the period of one year. On January 10, 1881, the following order was entered by the court:

1. BASTARDS: proceedings in bastardy as evidence.

"And it is hereby ordered and adjudged by the court that the judgment in this case, rendered in this court January 17, A. D. 1879, be and the same is hereby vacated from this date, on the execution by the necessary parties of the proper instrument in writing authorized by the statute for the adoption of children, said instrument to be one whereby the said child, Clara Johnson, shall be adopted by Olaus Svenson and his wife Sophia. Said Hugh McKellar and the clerk of the circuit court of Clayton County to signify their consent thereto by signing said instrument, and said Hugh McKellar to pay this day to the said Sophia Svenson the sum of $60; then the judgment in this cause to be vacated."

On the same day, the following article of adoption was executed, pursuant to which the custody of the child passed to the adoptive parents:

"Know all men by these presents, that we, Olaus Svenson and Sophia Svensou, his wife, of the town of Clermont in the county of Fayette in state of Iowa, in consideration

of the sum of sixty dollars in hand paid by Hugh McKellar of the township of Highland in the county of Clayton in the state of Iowa, and in accordance with the order of the district court of said Clayton County this day made, do adopt as our own Clara Johnson aged four years, and confer upon said child all the rights, privileges and responsibilities which would pertain to her if born to us in lawful wedlock, and I, Hugh McKellar, an unmarried man, having the care and providing for the wants of said child, and being by the judgment of said court at its September term, 1876, declared to be the father thereof, do consent to the adoption aforesaid of the said Clara Johnson by the said Olaus and Sophia Svenson, the said child to be hereafter called and known as Clara Svenson, and is to be given to the said Olaus and Sophia Svenson for the purpose of adoption as their own child, the mother of said child being Elsa Johnson, and I, J. F. Thompson, clerk of the circuit court of said Clayton County, Iowa, do hereby give my consent to the adoption as aforesaid.

"In witness whereof, we have hereunto subscribed our names this 10th day of January A. D. 1881.

"Olaus Svenson

her

"Sophia (X) Svenson

mark

"Hugh McKellar

"J. F. Thompson

"Clerk of Circuit Court."

The case, for the appellees rests largely upon the following sections of the Code:

"Section 3384.  Illegitimate children inherit from their mother, and she from them.

"Section 3385.  They shall inherit from the father when the paternity is proven during his life, or they have been recognized by him as his children; but such recognition

must have been general and notorious, or else in writing. Under such circumstances, if the recognition has been mutual, the father may inherit from his illegitimate children."

Was the record in the bastardy proceeding, including the verdict and judgment, available to the appellees as proof of the paternity of the child? Further, was it available to the appellees as evidence that the paternity was proven during the life of the putative father? To answer these queries in the negative would be to render this part of Section 3385 meaningless.

No other form of proceeding is readily conceivable, under our statutes, whereby such proof could have been made in his lifetime. It is argued that the judgment entry did not declare the paternity. This fact was found by the verdict of the jury, rendered in the light of the instructions of the court. In terms, the judgment of the court required the defendant to pay the costs and to pay the installments already mentioned for the support of the child. The finding of guilt was essential to the entering of any judgment whatever against the defendant. We do not think it was essential to the validity of the judgment that it should have contained a recital of the verdict, or of the fact of defendant's guilt. The more strenuous contention of the appellants is not at this point, and we pass it without further discussion. Section 4722 of the Code of 1873 provided:

"The court may, at any time, enlarge, diminish or vacate any order or judgment rendered in the proceeding herein contemplated, on such notice to the defendant as the court or judge may prescribe."

Pursuant to the foregoing statute, the circuit court made the successive orders of May 19, 1877, January 17, 1879, and January 10, 1881, already referred to. We have set out the last order of the court in full, because much

2. JUDGMENT:
vacation: operation and
effect.

of the contention of appellants is based upon it. It is urged that the order of January 10, 1881, was such a vacation of the original

judgment as to render it entirely nugatory, and therefore not available to the appellees as evidence, for any purpose whatever. It is ordinarily true that the vacation of a judgment involves the setting of the same aside. It is also true that, when a judgment is set aside, it is no longer a judgment. If it be no longer a judgment, it is no longer enforcible as such, nor available as evidence of the facts upon which it formerly rested. Conceivably, a judgment might be said to be vacated when it was fully satisfied or commuted. In such a case, it could not be further enforcible, but the facts upon which it rested would still remain a verity.

Reading the order of the court in its entirety, its meaning is not obscure. It will bear no other interpretation than that it was intended thereby to commute the payment of installments, and to terminate conditionally the further liability of the defendant therein for further payment. To put the contrary interpretation upon it is to render the entire order inconsistent with itself. By the very terms of such order, it recognized the binding force of the original judgment as an adjudication. Except for the binding effect of such original judgment, the court had no power to order the payment of $60 by the defendant, nor to attach the condition of adoption to the discharge of the defendant. The three successive orders of the court, made in May, 1877, January, 1879, and January, 1881, all rested upon the authority of the original judgment. They modified successively its requirements, but they did not impeach its validity. The last order did not, in terms, purport to vacate the *original* judgment, but only the judgment of January, 1879, which specified the installments of payment at that time exacted. The order in question was not based upon any reinvestigation of the facts, nor upon any challenge by the defendant of the verity of the judgment and the facts upon which it rested. Pursuant to such order, the defendant Mc-

Kellar became a party to an article of adoption of the child. In such writing, he expressly recognized the continuing validity of such judgment. The liability of a judgment defendant for further performance in a bastardy proceeding must appropriately terminate sometime, and under some conditions. *State v. Hastings,* 74 Iowa 574. He may settle with the mother and obtain full discharge. *Holmes v. State,* 2 G. Greene 501; *Black Hawk County v. Cotter,* 32 Iowa 125; *State v. Nobles,* 70 Iowa 174. In the absence of such settlement, the power rests with the court to fix time and condition. It is not misleading to term such an order a vacation of the judgment. Such an order is entirely consistent with the propriety and legality of all previous proceedings; nor does it undo the verity which inheres in the original judgment. We think it clear, therefore, that the evidential value of the record of the original judgment and of the proceedings leading up thereto, was not destroyed by the order under consideration.

II. Did McKellar acknowledge the paternity of the child in writing? In view of our finding in the foregoing division, this question is of doubtful materiality. It may have some bearing, however, upon a question to be later considered, and it has been argued fully by the parties. If there was an acknowledgment in writing, it is to be found in the article of adoption already set forth. Section 2308 of the Code of 1873 sets forth the requirements of a valid article of adoption. It provides:

3. BASTARDS: written recognition: articles of adoption.

"In order thereto, the consent of both parents, if living and not divorced or separated, or, if unmarried, the consent of the parent lawfully having the care and providing for the wants of the child, * * * shall be given to such adoption by an instrument in writing signed by the parties," etc.

One of the conditions of the vacation order already set

forth was "the execution by the *necessary* parties of the proper instrument in writing authorized by the statute for the adoption of children. Said instrument to be one whereby the said child Clara Johnson shall be adopted by Olaus Svenson and his wife Sophia." Under the statute above quoted, a necessary party to such instrument was "the *parent* lawfully having the care and providing for the wants of the child." The signature of the "parent," therefore, was essential to the validity of the instrument. The mother did not sign it; McKellar did. He so signed it in purported compliance with the statute already quoted. The language adopted by him in the body of the instrument was as follows:

"I, Hugh McKellar, an unmarried man, having the care and providing for the wants of said child, and being (by the judgment of said court at its September term, 1876, declared to be) the father thereof, do consent," etc.

The parentheses are ours, and are used for convenience of reference. It is contended by appellants that the parenthetical words amounted to an implied denial of the parentage, and that they indicated a mere submission to an unjust judgment. It is not impossible that the language adopted was intended to cover mental reservations on the part of McKellar, but the words must be construed in the light of the purpose for which they were incorporated by him into the instrument. If he had, in terms, denied the paternity, it would have rendered the article void on its face. The condition to the vacation of the judgment would thereby have failed. To imply a denial, therefore, where no direct denial was made, would be to work a fraud upon the adopted child and the adopting parents. If McKellar was not the parent having the care and providing for the wants of the child, then his name had no proper place in the instrument. The order of vacation required that such instrument should be executed by "the necessary parties."

A *parent* was a necessary party. McKellar was the only parent, if any, who signed the instrument. The instrument was presented as a compliance with the condition enforced by the court. In order to sustain the validity of such adoption, it would have to be held that McKellar was the consenting parent. Suppose that a proceeding had been had, assailing the validity of the adoption in question, and that, in such proceeding, it had been proved that McKellar was not, in fact, the father of the child. Suppose, further, that the adoption had been defeated on such ground. The fact would remain that, in the execution of such paper, he purported to be the father. This is all that is essential for our present consideration herein. If he purported to be the father, then he acknowledged the paternity in writing. Such acknowledgment, being thus made, is available to the appellees, as evidence both of the fact of paternity and of the written acknowledgment thereof; and its admissibility as evidence cannot be destroyed by subsequent denials or contrary proof. And this is so even though its weight as evidence of the fact of paternity might be overcome by contrary proof. The admissibility of this instrument as evidence is not affected by any ulterior purpose or mental reservations which McKellar may have had. It is enough that he signed the writing, knowing what it was. *Britt v. Hall,* 116 Iowa 564; *Watson v. Richardson,* 110 Iowa 673; *Brock v. State,* 85 Ind. 397. The parenthetical statement above set forth can be construed as a recital in corroboration of the paternity. The fact that the child was born out of wedlock would invite such corroboration; and such recital could be deemed as analogous to a pleading of evidence. Such construction gives recognition to the purpose for which the acknowledgment was made. To imply a denial of paternity or absence of acknowledgment thereof, would be to destroy the instrument of which the recital became a part. We are clear that the recitals of this instrument, and

the signing thereof by McKellar, were a formal and solemn acknowledgment of the paternity of the child, and that they will not bear implication to the contrary.

III.   Clara Johnson Adams having predeceased her putative father, can her legitimate children stand in her shoes, and inherit such estate as she would have inherited from such parent if she had survived him?

4. DESCENT AND DISTRIBUTION: heirs of bastard: putative grandfather.

It is earnestly contended by appellants that they cannot.   The contention is that, though the statute gives to the illegitimate child a right to inherit from the father, where the paternity is proved during his life, or where it has been acknowledged in writing, such statute does not carry such right to the descendants of the illegitimate.   To put the contention in another way, her descendants are her heirs, but they are not heirs of her father.   It is true that our statute which confers a right of inheritance upon an illegitimate child does not, in terms, confer the right of inheritance upon the descendants of the illegitimate, from the ancestors of the illegitimate.   The question, however, is quite foreclosed in this state by *Johnson v. Bodine*, 108 Iowa 594, and by *McGuire v. Brown*, 41 Iowa 650; and we might well rest the question upon these prior decisions. But appellants insist that these cases are unsound, and out of joint with the rest of the world.   It is also urged that our opinion in the *Bodine* case erroneously assumed that the result reached was required by the holding in the *McGuire* case; and that the later opinion shows that the holding would have been otherwise, if the holding in the *McGuire* case had been properly understood.   Under a statute which is now Section 3384 of the Code, it was held in the *McGuire* case that an illegitimate child of a deceased mother did inherit, through the mother, and, through the mother's parents, from the mother's brother.   In that case, the mother had died before the inher-

itance was cast. In the *Johnson* case, it was held that the children of an illegitimate daughter would take, through their mother and through the putative father of such mother, a devise to the heirs of such putative father. This holding involved interpretation of a statute now appearing as Section 3385 of the Code. The opinion in the *Johnson* case does not indicate a misunderstanding of the holding in the *McGuire* case. The writer of the opinion did express doubt as to the correctness of the holding in the *McGuire* case, but joined in adherence thereto because the same had become a rule of property. In neither of the statutes under consideration in these cases was there any express provision that an illegitimate could inherit from an ancestor of its parent; nor was there any provision, in terms, that the descendants of an illegitimate could inherit from an ancestor of either father or mother. The effect of our holding in the *McGuire* case was that the right conferred upon an illegitimate to inherit from her mother carried with it the right to inherit from her ancestors whatever the mother herself would have inherited, if living. What we held in the *Johnson* case was that Section 3385, conferring upon an illegitimate the right to inherit from the father, when the paternity is properly proved, carries with it the right of inheritance down the line of the descendants of the illegitimate. It may be conceded that there is much authority to the contrary. The decisions referred to were not made in ignorance of that fact. The general purport of the argument in support of the contrary authority is the old rule at common law, that an illegitimate has no inheritable blood, and is without kin and without ancestry. Inheritances, therefore, cannot pass through the blood of a bastard. He can have no heirs save those of his own body; and the ancestry of such heirs terminates in the bastard. The rule is stated briefly by Kent as follows:

"A bastard  *  *  *  has no inheritable blood, and is incapable of inheriting as heir either of his putative father or his mother, or of anyone else, nor can he have heirs but of his own body." 2 Kent, Commentaries, 212.

This rule has been one of the reproaches of the common law, which has shocked the legislative and judicial conscience of the civilized world. That a bastard has no inheritable blood is only a legal fiction. Legal fictions have their appropriate uses. They are the stepping stones of the law's reasoning; the parables whereby its principles are illustrated. When its reason fails, the fiction falls. The fiction that a bastard has no inheritable blood has been shorn of its reason in this state by legislation. It remains, therefore, a fiction only. Our legislation has conferred upon the illegitimate the right of inheritance, with appropriate safeguards as to the certainty of paternity. Why, therefore, should we deal with finespun theories of the common law as to inheritable blood? The only justification ever offered for the common-law fiction was that bastardy should be rendered odious. But bastardy is the sin of the parent; not of the child. The illegitimate child is as innocent as the babe of Bethlehem. Yet the common law held its fiction as a shield over the guilty parent, and frowned upon the guiltless child with the disdain of a Pharisee. Our early territorial legislation struck at the cruel injustice of this fiction. From territorial days until now, there has never been a time in this state when it has not been contradicted by existing legislation. The *McGuire* and *Johnson* cases were decided in response to the spirit of such legislation, and are in entire harmony therewith.

IV. It is urged that the putative father had no right of inheritance from the children of the illegitimate, and that, for want of mutuality, therefore, such children should have no right of inheritance from him. The argument has its force, as a rule of construction, and not otherwise. It

would be an appropriate consideration, also, for a legislative body. In the case before us, the want of mutuality is to be found in the existing statute. It is within the power of the legislature to withhold mutuality. Under Section 3384, there is mutuality as between a mother and an illegitimate child. Under Section 3385, there is only a qualified mutuality provided as to the putative father. Notwithstanding such want of mutuality, such section does confer the right of inheritance upon the child. It is not wholly without reason that the statute should withhold the right of inheritance from the putative father, except upon the condition specified therein. The provision for the child may be looked upon as a species of redress for the wrong perpetrated by the father. Moreover, the condition imposed is not an onerous one. This condition is that, in order to entitle the putative father to inherit from his illegitimate child, there must have been appropriate recognition or acknowledgment of the paternity by such child. There is a touch of the uncanny in this requirement. It implies that there may be doubtful or conflicting claims of paternity of an illegitimate child; and that the child should "know its own father." Such conflicting claims of paternity are so rare that none has ever come to our attention. If such a case of conflict should arise, it would indeed be a "wise child" that could extend recognition to the proper contender. As a matter of common observation, it may safely be said that the illegitimate child has usually been glad to acknowledge the paternity which first extends the arms of acknowledgment to it.

Furthermore, while the argument based upon the want of mutuality is directed in the brief only as against the descendants of the illegitimate, yet, if adopted, its logical result would be to withhold the right of inheritance from the illegitimate herself. This would be in direct contravention of the statute.

It is urged, also, that the statute which confers the right of inheritance upon the illegitimate does not change its status as an illegitimate. This may be conceded. It was so held in *Brisbin v. Huntington,* 128 Iowa 166, 175. But this does not reduce the effect of the statute which confers upon the illegitimate the right of inheritance. Though illegitimate, her disabilities as to right of inheritance are lifted by the statute. Her paternity being proved with that certainty required by the statute, her biological blood line becomes endowed with the right of inheritance.

Lastly, it is urged that the adoption of an illegitimate so connects her with the blood line of the adopting parents that she should thereafter be deemed as the child of the adopting parents, and not of the putative father. It was held in *Wagner v. Varner,* 50 Iowa 532, that an adopted child, though acquiring by adoption the right to inherit from its adopting parents, did not thereby lose the right to inherit from its natural parents. The child in that case was legitimate. We see no reason to say that the adoption of an illegitimate child would deprive it of such right as it had of inheriting from its natural parents.

5. DESCENT AND DISTRIBUTION: adoption of bastard: effect on inheritance from natural parent.

We reach the conclusion that the trial court correctly decided all features of the case. The case has been presented here on both sides with great ability and thoroughness. Nothing in the way of appropriate argument has been overlooked by counsel. After the fullest consideration of the briefs, we find ourselves content with the holding in *Johnson v. Bodine,* supra. The decree entered below is, therefore,—*Affirmed.*

PRESTON, C. J., LADD and STEVENS, JJ., concur.