HICKS, administrator, *et al. v.* SMITH *et al.*

1. Bastards have, generally, no inheritable blood, and save by express statutory enactment, cannot take by descent.
2. A bastard who has been legitimated by order of the superior court under the provisions of section 1787 of the code, by force of that provision of the law may take by descent from his father only.
3. Where, by the provisions of a will made by the great-grandfather of a bastard on the paternal line, an estate is vested in the father of a bastard for life with remainder over to his children, and he failing issue, remainder over in fee to other great-grandchildren of the testator, upon the death of the father of such bastard without issue other than such legitimated bastard, while the latter, by force of the statute, may take by descent from his father, he cannot take by purchase under the will of his great-grandfather which devises the estate to his great-grandchildren generally, there being in the will no language expressly indicating a purpose to include within the scheme of his benevolence any bastard descendants.

January 14, 1895.

Equitable petition. Before Judge GAMBLE. Johnson county. November 6, 1894.

JAMES B. HICKS, EVANS & EVANS and JAMES K. HINES, for plaintiffs. JACKSON & LEFTWICH, for defendants.

ATKINSON, Justice.

In October, 1853, a testator died leaving a will which was executed March 28th, 1850, and a codicil thereto,

executed September 27th, 1853. The will and codicil were duly probated November 7th, 1853. The two items of the will necessary to a consideration of this case, and which were introduced in evidence, are as follows:

" Item 11. I will and direct that my plantation known as Fullerville, lying partly in Washington and partly in Laurens county in said State, shall be divided, as soon after my death as possible, into two parts or shares as nearly equal in the number of acres as may consist with equality in value, including in one part or share No. 1 the portion of land lying in Washington county with the mills and other water privileges, and in the other part or share No. 2 the portion of land lying in Laurens county. But should the land in either county be considerably greater in quality than that in the other, then I do not desire that the county lines should govern in setting off the shares, my object being only to make two plantations of as nearly equal size as possible, to accomplish which the county lines may be disregarded, and the difference in the value of the two shares shall be made good to the least valuable share in the manner hereinafter directed.

" Item 12. I give and devise share number 1, mentioned in item eleven, to my beloved daughter Malvina V. Parsons, for her sole and separate use for and during the term of her natural life only, free and exempt from the debts, contracts, liabilities or disposition of her present or any future husband; and from and immediately after the death of the said Malvina V. Parsons, I give and devise the same unto her child or children living at the time of her death, and their heirs forever, but in default of any child living at the time of her death, then the said land to return to and be equally divided among my children and other legal representatives *per stirpes;* provided always, that the share or shares falling to her sons Thomas Henry Parsons and James William Parsons, according as one or both may survive her, shall remain to him or them for and during the term of their respective natural lives only, remainder to their children living at the time of their death and their heirs forever, but in default of such children, remainder to the other

lineal representatives of my said daughter, but in default of any other lineal representatives of my said daughter at the death of the said Thomas Henry Parsons and James William Parsons, remainder over to be equally distributed among my children and their lineal representatives *per stirpes.*"

The codicil was as follows, to wit:

"It is will and desire that the devises contained in the 11th and 12th items of my said last will and testament be so changed as to read thus: I give and devise my Fullerville plantation, lying partly in Washington and partly in Laurens county in said State, embracing all the lands attached to said premises, unto my beloved daughter Malvina V. Parsons, for her sole and separate use for and during the term of her natural life only, free and exempt from the debts, contracts, liabilities or disposition of her present or any future husband; and from and after her death the said devised property in this item of this codicil named, to be subject to all the conditions, restrictions and limitations in said 12th item in said last will and testament set forth."

The executors of the testator delivered the property described to Malvina V. Parsons, and she remained in possession until her death in 1874. She left only two children, William H. Parsons, who died in 1887 (he being the husband of one and the father of the other of the defendants in this case), the other of said sons being Thomas A. Parsons, who died on January 7th, 1894. Though there is an apparent discrepancy between the names of these two sons as expressed in the pleadings and as stated in the will, the evidence explained satisfactorily how this discrepancy occurred, and it may be taken as a fact that they are the same persons mentioned by the testator in his will. Thomas A. Parsons (one of the sons of Malvina V. Parsons), who did not marry, was the father of T. A. Parsons, one of the plaintiffs in this suit, and by an order of the superior court, dated September 30th, 1892, caused T. A. Parsons, one of the present plaintiffs, to be regularly and duly legitimated.

After the death of T. A. Parsons, the defendants, who were the wife and daughter, respectively, of W. H. Parsons the brother of T. A. Parsons deceased, entered and took possession of the premises which had been apportioned to T. A. Parsons for his life-estate under the terms of the will of Henry P. Jones. An equitable petition was filed by Thomas B. Hicks, who was the administrator of T. A. Parsons deceased, and by T. A. Parsons (the legitimated son), setting up title in the latter to the property in controversy, and claiming the right to the possession of the premises, and as well an accounting from the defendants for rents, etc., and praying for injunction and the appointment of a receiver. It appeared that the defendants were entirely solvent, but upon the hearing the court denied the injunction upon the ground that the plaintiffs exhibited no such title or interest in the premises as justified the grant of an injunction at their suit. These are the substantial facts upon which the issues made in this case are presented, and upon these we are to determine whether or not the plaintiffs had any title to the property claimed.

1–2. We will first consider what the real status of this natural son is. At common law the rights of a bastard were few, and they such only as he could acquire. Having no inheritable blood by operation of the law of descent, no estate could be imposed upon him. For in order to take by descent he must be capable of inheriting, and this he could not do because he was not and could not be an heir. Having the capacity to labor, there was no legal impediment to the acquirement of an estate by him. Being without inheritable blood, he was of kin to no one, could have no ancestor, could be heir to no one, and, for the same reason, he could have no heirs save those of his own body. In process of time, however, the rigor of the common law has been in most countries where its rules prevail much abated, and its

asperities so softened and tempered by humane legislative enactment, that bastards have many rights and are now accorded many privileges which, under the common law, were denied them.   To this spirit of liberality, which at the present time seems to pervade the whole scheme of legislation with respect to these unfortunates who are in no sense responsible for their existence, may be attributed the statutes which are now of force in this State and by which the condition of the bastard is vastly improved.

The General Assembly early saw the propriety of allowing a bastard to inherit from its mother, and bastard children of the same mother, without reference to their paternity, to inherit each from the other.   The law of escheats forfeited to the State the estates of such persons who, dying intestate, left no heirs.  It was held by some of the courts, that for want of inheritable blood in her descendants the bastard children of a mother dying intestate were incapable of taking her estate, and by force of the statute the same was forfeited to the State to the exclusion of those who upon the commonest principles of humanity should and would have been the recipients of her bounty.   For remedy of this palpable injustice, in 1816 the legislature passed an act the provisions of which are contained in section 1800 of the code, and which relieves bastards of some of the disabilities imposed by the common law.   So the act of 1850 was passed to allow bastard children of widows to inherit equally with those who were legitimate.

The status of the bastard as fixed by the common law, except as changed by statute, remains under our system of laws.   The rules of the common law generally are recognized by our code, and with respect to all matters in which it has not been changed by legislative enactment, or in process of time by judicial decision to meet the varying conditions in the affairs of men which

have arisen in the onward march of progressive civilization, remain unchanged. Bearing in mind his original status, the changes made by previous laws, and mindful of the further fact that in some cases a reputed father might, as far as possible, desire to make reparation for the wrong he had done the unfortunate and innocent offspring of his lustful desire, the legislature, from time to time, passed individual enabling acts, and this practice was continued until the adoption of the general law upon that subject, approved March the 6th, 1856, prescribing the manner by which persons born illegitimate might be rendered legitimate, the provisions of which act are incorporated in section 1787 of the code. The purpose of this act, as expressed in its title, was to "prescribe the manner in which persons born illegitimate should be made legitimate." In the legislative mind was this purpose. It had the power to confer upon such a child in the act of legitimation all of the attributes, including inheritable blood, of a perfect son born in lawful wedlock; it had the power to purge his blood of all impurity, and, despite the strictest rule which ever prevailed under the ancient feudal system, make him eligible to the succession. The whole subject, as to how far and to what extent it would confer inheritable blood was within the scope of legislative power. One word without qualification was sufficient to give him this status, and that one word, without more, "legitimate." To have said in the act that upon compliance with its terms, the court shall pass an order declaring said child "legitimate," according to an unbroken current of authority, this language, without more, would unquestionably have conferred upon him the power to inherit from his father. According to most of the adjudicated cases, it would have injected into his veins inheritable blood in its most comprehensive sense, and have authorized him through his reputed father to take

by descent from ancestors on the paternal line. Then
why make any addition to this simple statement that
the child be made "legitimate"? why add the further
significant words, "and capable of inheriting from his
father"? We have already seen that this language
could not and did not enlarge the capacity of the child
to take if he was "legitimate." Then that one word
expressed the quality of being able to take by inherit-
ance, certainly from his father, probably in its broadest
sense. If then these words could not enlarge the scope
of the term "legitimate," what could have been the
purpose of the legislature in adding them? Could they
operate as a limitation upon its effect in its more ex-
tended sense? It must be borne in mind that in the in-
terpretation of a statute, it must be so construed as that
all the language employed by the legislature may be
given some meaning. Courts will always presume that
the legislature uses language appropriate to the expres-
sion of the legislative purpose, and therefore do not feel
at liberty to disregard any portion of the language em-
ployed by it in the expression of its design, unless the
same be without meaning or bear a most absurd or unrea-
sonable significance. When we consider then that the
introduction of these words could neither enlarge, give
scope to nor emphasize in any way the word "legitimate,"
we naturally conclude that the legislature, in discussing
the matter, reached the conclusion that the word "le-
gitimate," standing alone, was too broad. It might
well have concluded that while it was in consonance
with a sound public policy to enable a contrite parent
out of his own estate by this process of legitimation to
provide for his natural son, and by recognition of the
relation in addition relieve him of the imputation cast
upon him by reason of his birth, yet to enable the
father by this simple judicial contrivance to confer upon
his bastard son inheritable blood generally might operate

greatly to the prejudice of others who stood with the reputed father in the same relation to a common ancestor. The legislature might have well considered that such an ancestor would have no interest in making a bastard descendant equally with his other legitimate descendants a recipient of his bounty. It might well have concluded to limit the effect of this proceeding to enabling the illegitimate to inherit *from* the father, without likewise enabling him, by inheritance *through* the father, to take by descent from the ancestors of the latter an estate which did not vest in his lifetime. The father had the right to dispose of *his* property as he saw proper, and the General Assembly could see no good reason in morals or law why as to his own estate the father could not by his own voluntary act place his bastard children in the direct line of legal succession. Thus applied, all of the words of the statute may be rationally employed in its interpretation. So interpreted, it becomes a highly beneficial statute, producing no evil consequences, entailing no hardships, working no injustice, and conferring upon the subject of its benefactions whatever the parent would have the legal or moral right to give.

The views herein expressed are in perfect harmony with, and are supported and sustained by, adjudications of this court made upon special legitimating statutes passed before the adoption of the general law upon the subject which is embraced in the section of the code hereinbefore referred to. In the leading case of *Shelton et al.* v. *Wright*, 25 *Georgia*, page 636, this court states broadly that such statutes are to be strictly construed, and, so construing the particular statute then under consideration, it holds that a statute which *fully* legitimated and made the illegitimate the heir at law of her reputed father and made her capable in law of inheriting the property of her reputed father as though born in

lawful wedlock, would confer upon the person legitima-
tized by its provisions the power to take by inheritance
the property of the reputed father. By the very terms
of this act, not only was she legitimated so as to ena-
ble her to take from the father, but she was *fully* legit-
imatized—in other words, rendered for all purposes
legitimate and competent to take any property coming
from her father. This court held that the words *fully*
*legitimate* were not qualified by the subsequent expression
" and competent to take the property of the father as
though born in lawful wedlock," and were not thereby
restricted in their application to an inheritance from him
direct, so as to exclude an inheritance from a legitimate
child of the father as to property coming *from him*. But
we apprehend a different question would have arisen,
even though the child were legitimated as the child of
the father, if the inheritance were of property descend-
ing upon the maternal line of the legitimate children
or otherwise than through him. The legislature may
well leave a man free to dispose of his own property,
either by will or act of legitimation. This decision goes
no further than to declare that with respect to such
property an heir may be created by act of the legisla-
ture. But where others are jointly interested in an in-
heritance as remaindermen or otherwise, in so far as the
interest of such person can be affected thereby, the law
recognizes no such method of creating an heir.

From the section of the code in question and from
the act of legitimation from which that section is codi-
fied the word *fully* is omitted. As we have seen, we
may fairly presume that this omission was intentional.
While the tendency of the courts has been recently to-
ward the adoption of rather more liberal rules for the
interpretation of statutes of legitimation, than those
which formerly prevailed, we conclude that the wisest
and most conservative construction to place upon this

v 94-52

statute is that which gives full scope and expression to all powers of a reputed father over his own estate, and at the same time protects others who may be interested with him as heirs of a common ancestor, against the possibility of having coheirs created out of the order of nature. We therefore hold that in proceeding under section 1787 of the code, the judgment therein authorized does not have the effect to render legitimate a bastard child according to the full significance of that term, but only the effect to render him so far legitimate as will enable him to inherit from his father.

3. We will now consider whether the plaintiff in this case took as a purchaser under the will of Henry Jones, by virtue of the devise contained in the items thereof which hereinbefore appear. By the terms of this will the estate devised was limited to the reputed father and his children, and, he dying without children, remainder over in fee to the children of his brother. In arriving at the true interpretation of these words—at the true construction to be placed upon this bequest, it is necessary to determine what was the intention of this testator, and to that end it is necessary to some extent to inquire as to the legal significance of the terms employed by him in the expression of that intent. The will itself being free from ambiguity, its meaning must be arrived at by reference to its own terms and without resort to extrinsic facts or circumstances. In reaching a result, then, it will not be unprofitable to bear in mind a few general propositions, the correctness of which will not be seriously questioned. (1) The law indulges no presumptions against the right of the heir standing in the direct line of legal succession. (2) Without the use of language clearly manifesting such a purpose, a testator will not be presumed to intend to extend his bounty to other than those who are authorized to take by descent. (3) The word *children*, as a general rule, means legitimate

children, and will not be extended by implication so as to embrace children other than legitimate, unless such construction be necessary to carry into effect the manifest purpose of a testator.

What is the legal status of this plaintiff? Whether he sues as the heir at law of his reputed father, or by virtue of a supposed right as a purchaser under his great-grandfather's will, he cannot recover, because the estate to his father was limited by the express terms of the will to enjoyment by him during his natural life; at his death, the remainder interest in fee was vested in his children, and he having none, in the children of his brother. Does this plaintiff come within the class of persons who could take under this provision of the will? Was he in legal contemplation the child of Thomas A. Parsons? Was he such a child as the testator can be legally presumed to have had in contemplation at the time of the execution of the will? We have seen that, though he might have been of the blood of Thomas A. Parsons, and while he was, at the instance of his reputed father, made legitimate by an appropriate order of the court, yet that the legal effect of such judicial legitimation was only to so far confer upon him a status as a legitimate child as to enable him to inherit from his father. For all other purposes he was still a bastard. He could take by force of the statute as the heir of his father, but he could not thus take as a purchaser under the will of his great-grandfather. There is nothing in the will justifying the inference that it was the intent of the great-grandfather to include him as a legatee thereunder. His rights are referable to strict law. No presumptions will be indulged in his favor, and we will presume that the testator intended to use the word *children* with reference to its strict legal significance, rather than as in its conventional sense it is occasionally employed. To undertake to presume at this late day that

it was the purpose of this testator to provide by his will for all his descendants, legitimate or illegitimate, and that he intended as he employs the term *children* to apply it indiscriminately to all descendants without reference to antecedents or the circumstances of birth, not only does violence to his expressed desire legally manifested by the terms of his will, but it may not wholly consist with his idea of the propriety of indiscriminately mixing up descendants. His ideas upon the propriety of begetting illegitimates, and, after they were begotten, to what extent the father's obligation to provide for them would justify their adoption, might have greatly differed from those of his grandson. He might have been perfectly willing that this grandson in the high and honorable state of lawful wedlock, without reference to the walks of life from whence his wife might come, should transmit his name and with it his estate to his posterity, while, on the other hand, he might not have been willing that, stepping aside from this honorable estate, this grandson should bring reproach upon his name by conferring it upon one whose only title to estate or name resulted, not from the order of nature operating in accordance with the ordinances of God, but by virtue of the statute in such case made and provided. At any rate, whatever may have been the intention of the testator with respect to such descendants, he used no such language as expressly or by fair implication can justify the inference that he intended to use the word *children* in other than the sense in which, according to its strict legal significance, it is authorized to be employed. He used no language which would embrace within its meaning the plaintiff or designate him as an intended recipient of his bounty. He therefore took no estate under the will in question, has no interest in the property in controversy; and the court properly, upon that ground, denied the prayer of his petition.              *Judgment affirmed.*