IN RE ESTATE OF KATE G. ELLIS.

JENNIE A. YANCEY, Guardian, Applicant, Appellee, v. FIRST NATIONAL BANK & TRUST COMPANY of Minneapolis et al., Executors, Appellants, CARLISLE ELLIS, Intervener, Appellee.

No. 44303.

1280

December 13, 1938.

Petition for Rehearing Dismissed March 4, 1939.

Larson & Carr and James E. Dorsey, for appellants.

R. W. Zastrow, W. G. Henke, Jens Grothe and John F. Droz, for applicant appellee.

W. H. Salisbury and H. R. Duncan, for intervener appellee.

STIGER, J.—Jennie A. Yancey, guardian of the property of Merritt Milton Yancey, a minor, brought this action to establish the rights of her ward in the estate of Kate G. Ellis, deceased, who died testate on November 15, 1934.

This litigation involves a construction of the following provision of the will of Kate G. Ellis:

"TENTH. All of the rest, residue, and remainder of my estate, if any, of whatsoever nature and wheresoever situated, I give, devise, and bequeath as follows:

"(1) One-half (½) thereof to the children and grandchildren of the late Charles D. Ellis, of Charles City, Iowa, living at the time of my decease, in equal shares;"

Charles D. Ellis was a brother-in-law of the testatrix. Carlisle Ellis, putative father of plaintiff's ward, Merritt Yancey, is a son of Charles D. Ellis. Merritt Yancey was adopted by plaintiff and her husband, Charles W. Yancey, in June 1917 when he was five months old and since that time he has lived in Charles City, Iowa, with his adopting parents.

The petition alleges that Merritt was born out of wedlock January 1, 1917; that Carlisle Ellis is his father and Charles D. Ellis is his grandfather; that the testatrix, also a resident of Charles City, was the grand aunt of Merritt; that Merritt is entitled to inherit under the last will and testament of decedent, as a grandchild of Charles D. Ellis, the sum of $16,000; that the testatrix, Kate G. Ellis, was fully cognizant during her life time of the existence of Merritt M. Yancey and his relationship to Carlisle Ellis and Charles D. Ellis and that the testatrix had full knowledge at the time of making her will that Merritt was the illegitimate son of Carlisle Ellis.

Carlisle Ellis intervened in the case and defendants and intervener filed the following demurrer:

"That the facts stated in the application attacked do not entitle the applicant to the relief demanded (Code Sec. 11141 (5) ) in that under the law of Iowa the word 'grandchildren' found in a will does not include illegitimates, unless an intent to include them can be deduced from the language of the will, without resort to extrinsic facts; that neither the Last Will and Testament and Two Codicils thereto of Kate G. Ellis, deceased, nor the application attacked show any intent on the part

of the testatrix, Kate G. Ellis, to include Merritt Milton Yancey within the term 'grandchildren of the late Charles D. Ellis' as used in Paragraph First of the First Codicil to her Last Will and Testament; that it therefore appears on the face of the application that neither the applicant nor Merritt Milton Yancey have any share in the residuary estate of Kate G. Ellis, deceased, under her Last Will and Testament and Two Codicils thereto or any right to the relief demanded.''

The demurrer was overruled, the defendants elected to stand on the demurrer, and on October 11, 1937, judgment was entered establishing the claim of Merritt Yancey against the estate of Kate G. Ellis. Defendants and intervener appeal.

■ The demurrer admitted that Carlisle Ellis is the father of Merritt Yancey, an illegitimate, and that the testatrix knew of this relationship at the time she executed her will.

■ At common law the word "children" when used in wills, deeds, or other conveyances, means legitimate children unless the will reveals a clear intention to use the generic term "children" so as to include an illegitimate child or it is impossible under the circumstances that legitimate children could take. Extrinsic evidence was not admissible to show the actual intent of the testator. Hill v. Crook [1873], L. R. 6 H. L. 265; In re Pearce, 8 British Ruling Cases, 279; 7 Am. Jur. 715; Jarmin on Wills, 1175.

Appellants state their position as follows:

''We firmly believe that the term 'grandchild' as used in a will, by both popular definition and judicial definition, means a legitimate grandchild only and never includes an illegitimate unless the will itself shows a contrary intention, or where it is impossible from the circumstances of the parties for any legitimate child to take under the class.

''We firmly believe that where there are legitimate grandchildren and where there is nothing on the face of the will showing an intention to include illegitimates, extrinsic evidence is not admissible to show any actual intent of the testator.''

Appellants rest their case squarely on the common law rule of construction.

The case of Hill v. Crook, supra, is the leading English authority for the common law doctrine and the case of In re

Pearce, supra, adheres to the Hill case. In the note to the case of In re Pearce, we find the common law doctrine, which is expounded in the above cases, severely condemned in the following language:

"A perusal of the decisions leads to the conclusion that this presumption (that the word child meant legitimate children) is most unfortunate and fundamentally unsound. * * * The true rule should be that 'children' is a neutral word taking its color from the surrounding circumstances. If it be considered as such, no difficulty will be experienced with the rule that parol evidence as to testator's intention is admissible, as the existence of natural children known to the testator will necessarily create the ambiguity which opens the door to such evidence. In support of this contention that the natural meaning rather than the legal meaning of the term children should be the presumptive meaning, attention is called to the fact that some of the American courts, which have rendered lip service to the English rule have virtually discarded it in rendering their decisions; that later English cases have been much more liberal in permitting a resort to extrinsic evidence and to the circumstance that the judicial committee of the Privy Council, in the case originating in India in which they accordingly felt at liberty to discard the English rule, did so."

█ The above criticism of the harsh English doctrine was independent of modern statutes permitting an illegitimate to inherit from the mother, and father, if recognized, which statutes abrogate the common law concept that a child born out of wedlock is the child of nobody.

In the case of Eaton v. Eaton, 88 Conn. 269, 91 A. 191, the court states [page 195]:

"The word 'children' in our Statute of distributions is interpreted to embrace a mother's illegitimate as well as legitimate children for the simple reason that the law regards the former as well as the latter her children. In a word, the natural corollary of the English rule that the word 'children' or 'child' when used in a Statute is to be restrained to signify legitimates only, is done away with as it logically must be. That corollary is the logical consequence of the proposition that the illegitimate is the child of nobody. When that proposition is transposed into

ours that an illegitimate is the child of its mother, then all logical foundation for the corollary that the words 'child' or 'children' in the statute, will or deed is to be interpreted as limited to legitimates disappears, and the logical corollary becomes the reverse, so that presumptively the word 'child' or 'children' in a will embraces offspring legitimate and illegitimate.

"That is the principle to be applied to the present case, so that, when the Testator made his limitation over to the children of his daughters, he will be held to have included all their children unless a different intent is to be gathered from the Will, read in the light of the surrounding circumstances.

"We are unable to discover in this Will, so read, any intent upon the part of the Testator to thus restrict the natural meaning of the words he employed. On the contrary he, at the time his Will was executed, presumably had full knowledge of the existence of the illegitimate child, then seven years of age, of his daughter and of its illegitimacy. * * * Had he not intended that the illegitimate child should share in the fruits of his bounty as a child of his daughter, it is scarcely conceivable that he would have been satisfied to use the unrestricted language that he did and language which in ordinary speech knows no distinction between legitimate and illegitimate."

In the case of Rhode Island Hospital Trust Company v. Hodgkin, 48 R. I. 459, 137 A. 381, the question was whether the phrase, "to the children of my daughter", as used in a will included an illegitimate child of the daughter. The court held that under the Rhode Island statutes modifying the status of an illegitimate, a child born out of wedlock is a legal child of his mother and is to be so regarded with reference to statutes dealing generally with the legal rights of children, and in the absence of a provision in the will to the contrary the term "children" would include illegitimate as well as legitimate children of the testator's daughter. Referring to an early Rhode Island case, In re Truman, 27 R. I. 209, 61 A. 598, which held that in the construction of a will the word "children" would generally be held to apply to legitimate children only, the court stated:

"The court's sole reference to authority was to a very illiberal decision of the House of Lords in 1873 [Hill v. Crook,

supra]. The language of the court undoubtedly had reference to the English common law rule of construction. We do not regard the reference as throwing any light upon the decision to be made here, governed as we are by the very liberal attitude of this court with regard to the status and the legal rights of those born out of wedlock.''

The court in the above Rhode Island case refers to the case of Hastings v. Rathbone, 194 Iowa 177, 188 N. W. 960, 23 A. L. R. 392, as illustrative of the growing liberality of the courts in the construction of statutes modifying the harshness of an earlier age. The court makes the following statement about the Iowa case:

''It appears that in Iowa by statute an illegitimate child may not only inherit from his mother, but from his father when the paternity has been proved during the father's life time or the child has been recognized by him as his child. There is another statute of Iowa restricting the power of a testator to make a testamentary gift to a charitable corporation in excess of one-fourth of the testator's estate after the payment of debts, if a spouse, child, or parent of the testator survives him. One Hastings died unmarried, leaving a will giving his residuary estate, largely in excess of one-fourth his entire estate, to a charitable corporation and making no provision for his illegitimate child, whom the testator in his life time had recognized as such. The court held that the illegitimate came within the designation of 'child' in the statute and was entitled to share in the distribution of the testator's estate.''

In the case of Smith v. Garber, 286 Ill. 67, 121 N. E. 173, the testator gave a life estate in certain real estate to Jane Gable and others and after the death of the survivor the land went to the child or children of Jane Gable. The sole question in the case was whether the defendant, the illegitimate child, was intended to be included by the testator by the words ''child or children of Jane Gable''. The court held that the common law rule that an illegitimate was the child of no one was abrogated by the statutes allowing him to inherit from the mother and that parol evidence was admissible to show whether the testator knew of the existence of illegitimate children to aid in determining from the will whether he intended they should

inherit. The court quotes from 2 Underwood on Wills, section 572:

"It may also be shown by parol evidence that certain illegitimate children had, at or before the date of the will, acquired the reputation of being the children of the testator or of the person whose name is mentioned in the will as the parent. Parol evidence is always received to show whether testator knew of the existence of illegitimate children." [page 175.] The court then states: "There is no evidence in the record that contradicts the testimony of Bucher that she [testatrix] knew at the time she executed the will of the existence of appellee and of his relationship to Jane Gable. It is quite reasonable to presume that she intended to include him under the word 'child,' and also intended to include any other children of Jane Gable, if she should have any by her late marriage."

In the case of Harness v. Harness, 50 Ind. App. 364, 98 N. E. 357, the testator devised real estate to his son and the remainder to the son's children. The court states [page 359]:

"If, upon a consideration of the whole instrument, in the light of the circumstances preceding and attending its execution, it appears that the testator intended to include a child of illegitimate birth, such intention prevails and must be given effect. * * * Here there is evidence tending to show that the testator knew the parties to this controversy and all the facts and circumstances relating to them when he excuted his will, that his son acknowledged the appellee as his own son * * *."

The court affirmed the decision of the lower court that an illegitimate was included by the word "children". See Bennett v. Toler, 15 Grat., Va., 588, 78 Am. Dec. 638; Sullivan v. Parker, 113 N. C. 301, 18 S. E. 347; Elliott v. Elliott, 117 Ind. 380, 20 N. E. 264, 10 Am. St. Rep. 54. At common law an illegitimate child could not inherit because he was the son of nobody, sometimes called *filius nullius*. The refusal of the above cases to follow the common law rule is a logical result of their repudiation of the common law concept that a bastard child is a child of nobody and statutes changing the status of such a child. Independent of statute, as shown above, the rule has been subjected to severe criticism. It was inevitable that, through an enlightened and more tolerant public opinion and a broader sense of

charity that developed from a truer sense of justice, the harsh, bigoted, unsound doctrine of the common law should be modified by a more humane and charitable concept of the status of a child born out of wedlock. This benevolent change in public opinion is reflected in the above cases and our own statutes and decisions. Code, sections 12030 and 12031, read:'

"12030. Illegitimate children—inherit from mother. Illegitimate children inherit from their mother, and she from them.

"12031. From father. They shall inherit from the father when the paternity is proven during his life, or they have been recognized by him as his children; but such recognition must have been general and notorious, or else in writing. Under such circumstances, if the recognition has been mutual, the father may inherit from his illegitimate children."

In the case of McKellar v. Harkins, 183 Iowa 1030, 166 N. W. 1061, which reaffirmed the rule established by our prior cases that an illegitimate has inheritable blood and that children of an illegitimate daughter who predeceased her putative father inherited the share their mother would have received from her father, Justice Evans states on page 1043 of 183 Iowa, page 1066 of 166 N. W.:

" 'A bastard * * * has no inheritable blood, and is incapable of inheriting as heir either of his putative father or his mother, or of anyone else, nor can he have heirs but of his own body.' 2 Kent, Commentaries, 212.

"This rule has been one of the reproaches of the common law, which has shocked the legislative and judicial conscience of the civilized world. That a bastard has no inheritable blood is only a legal fiction. Legal fictions have their appropriate uses. They are the stepping stones of the law's reasoning; the parables whereby its principles are illustrated. When its reason fails, the fiction falls. The fiction that a bastard has no inheritable blood has been shorn of its reason in this state by legislation. It remains, therefore, a fiction only. Our legislation has conferred upon the illegitimate the right of inheritance, with appropriate safeguards as to the certainty of paternity. Why, therefore, should we deal with finespun theories of the common law as to inheritable blood? The only justification ever offered for the commonlaw fiction was that bastardy should be rendered

odious. But bastardy is the sin of the parent; not of the child. The illegitimate child is as innocent as the babe of Bethlehem. Yet the common law held its fiction as a shield over the guilty parent, and frowned upon the guiltless child with the disdain of a Pharisee. Our early territorial legislation struck at the cruel injustice of this fiction. From territorial days until now, there has never been a time in this state when it has not been contradicted by existing legislation. The McGuire and Johnson cases were decided in response to the spirit of such legislation, and are in entire harmony therewith."

The court further states:

"It is urged, also, that the statute which confers the right of inheritance upon the illegitimate does not change its status as an illegitimate. This may be conceded. It was so held in Brisbin v. Huntington, 128 Iowa [166], 175, 103 N. W. 144, 5 Ann. Cas. 931. But this does not reduce the effect of the statute which confers upon the illegitimate the right of inheritance. Though illegitimate, her disabilities as to right of inheritance are lifted by the statute. Her paternity being proved with that certainty required by the statute, her biological blood line becomes endowed with the right of inheritance."

In the case of Brisbin v. Huntington, 128 Iowa 166, 103 N. W. 144, 5 Ann. Cas. 931, the court was called upon to determine whether the term "lawful issue" used in a will included a child born out of wedlock and held that statutes conferring on an illegitimate the right of inheritance were statutes of descent only and did not legitimate a child born out of wedlock, and therefore the term "lawful issue" included only legitimate children. However, the court recognizes the modifying effect of our statutes on the common law rule that the word children includes only legitimates unless it appears from the will alone that the testator intended to include illegitimates in the following language [page 174 of 128 Iowa, page 147 of 103 N. W.] :

"The decisions are unanimous that, *in the absence of statutory provisions modifying the common law with respect to illegitimate children,* the words 'issue,' 'child,' or 'children,' found in a will or statute, whether qualified by the word 'lawful' or not, are to be construed as only those who are legitimate, and, if others are intended, this must be deduced from the

language employed, without resort to extrinsic facts. * * * This is on the ground that at the common law a bastard child had no inheritable blood, was kin to no one, could have no ancestor, nor be an heir, and could have no heirs save those of his own body. But this rule has been greatly modified by the enactment of statutes ameliorating his condition, and in different degrees conferring the rights of legitimate children. The bastard was *nullius filius* mainly in the matter of inheritance." (Italics supplied.)

It should be noticed that Justice Ladd, who wrote the opinion in the Brisbin case, states that the common law rule is applicable only "in the absence of statutory provisions modifying the common law with respect to illegitimate children" and the learned Justice further remarks that "this rule has been greatly modified by the enactment of statutes greatly ameliorating his condition." See generally 3 R. C. L. (Bastards) sections 45 and 46.

Appellants cite among other authorities 70 A. L. R. 621, 2 A. L. R. 972; 7 Am. Jur., Bastards, sections 140, 141, 142; 94 A. L. R. 116; 69 C. J. pages 154 and 184. We have examined many of the cases cited and find that the authorities which sustain appellants' contention are based solely on the common law rule of construction and the theory that an illegitimate is the child of nobody, and hold that modern statutes do not modify the common law doctrine.

While many courts have refused to give any effect to statutes altering the status of illegitimate children and strictly apply the common law rule, on the other hand, as above shown, several of the American courts under the influence of statutes abrogating the harsh common law doctrine that an illegitimate is the child of nobody and a more enlightened conscience, have refused to follow the common law rule that the use of the word "children" or "grandchildren" excludes illegitimates unless the will clearly shows an intention to include them, or there are no legitimates to take.

Some of the decisions hold that because of statutes the presumption is that illegitimates are included by the use of the word children. In Wisconsin it is held that a devise to a child presumptively refers to a legitimate only, but the presumption is impaired but not destroyed by statutes making the illegitimate

1290

the heir of the mother. See In re Kaufer Will, 203 Wis. 299, 234 N. W. 504.

Our statutes have abrogated the common law concept which is, as stated in the case of Brisbin v. Huntington, 128 Iowa 166, 103 N. W. 144, 5 Ann. Cas. 931, supra, that "a bastard child had no inheritable blood, was kin to no one, could have no ancestor, nor be an heir, and could have no heirs save those of his own body". [Page 174 of 128 Iowa, page 147 of 103 N. W.]

■ Under our decisions, children born out of wedlock have inheritable blood. That portion of the case of Brisbin v. Huntington, supra, found on pages 178 and 179, 103 N. W. on pages 148 and 149, relied on by appellants to support their contention is mere dicta. See 69 C. J. page 184, note 2.

■ In the light of our statutes and decisions we conclude that we are not bound by the common law rule and declare that where such terms as children, grandchildren, or nephews are used in a will or deed and there are both legitimates and illegitimates and the testator has full knowledge of such fact and the intention of the testator is not clearly expressed in the will, the use of such words creates no presumption but the word is a neutral one and an ambiguity exists, and the intention of the testator or grantor must be determined not only from the provisions of the will but also in the light of the circumstances surrounding the execution of the will and parol evidence is admissible to prove the intent of the testator or grantor.

The trial court was right in overruling the demurrer, and the judgment appealed from is affirmed.—Affirmed.

KINTZINGER, MITCHELL, RICHARDS, and MILLER, JJ., concur.

SAGER, C. J., and HAMILTON, ANDERSON, and DONEGAN, JJ., dissent.

This case was originally assigned to Justice Hamilton who prepared and submitted an opinion which was concurred in by Justices Donegan, Anderson and Sager. This opinion expresses the views of the four judges named and they join in submitting the original opinion of Justice Hamilton as dissenting from that of the majority of the court.

HAMILTON, J. (dissenting)—On the 30th day of June, 1937,

Jennie A. Yancey as guardian of the property of Merritt Milton Yancey, a minor, filed in the District Court of Floyd County, Iowa, in the matter of the estate of Kate G. Ellis, deceased, an application to establish the rights of her ward in and to the property of said estate under and by virtue of the following residuary clause contained in the first codicil to the last will and testament of testatrix, Kate G. Ellis, which reads as follows:

"All of the rest, residue, and remainder of my estate, if any, of whatsoever nature and wheresoever situated, I give, devise, and bequeath as follows:

"(1) One half (½) thereof to the children and grandchildren of the late Charles D. Ellis of Charles City, Iowa, living at the time of my decease in equal shares."

The application alleges: That the said Kate G. Ellis died testate in Charles City, Iowa, on November 15, 1934, leaving her last will and testament and two codicils thereto, which were admitted to probate, and that the estate is being administered in the district court of Floyd County, Iowa. That said minor was born out of wedlock on January 1, 1917, to one, Lucille McRobert, an unmarried person, and was on June 8, 1917, adopted by Charles W. Yancey and Jennie A. Yancey, the applicant, and was ever after called and known by the name of Merritt Milton Yancey and reared in the home of his foster parents, residing in Charles City, Iowa, who, until very recently, concealed from him the names of his natural parents. That the father of said minor "is Carlisle Ellis * * * who in the year 1917 lived with his parents, Charles D. Ellis and Flora Ellis, in Charles City, Iowa. That Kate G. Ellis, now deceased, for the greater number of years last past was a resident of Charles City, * * *. That her husband, A. E. Ellis died about the month of February, 1919. That A. E. Ellis was a brother of Charles D. Ellis. That Charles D. Ellis and A. E. Ellis were partners in Charles City. * * * That Merritt Milton Yancey is the grandson of Charles D. Ellis and within the purview and meaning of the clause above quoted of the first codicil of the Last Will and Testament of Kate G. Ellis, deceased. * * * That out of said residuary estate Merritt Milton Yancey, the ward of this guardian, is entitled to substantially the sum of $16,000.00." That the executors have omitted the name of said

minor from the list of heirs filed in said estate and from the list of persons entitled to inherit as the grandchildren of Charles D. Ellis. That as such grandson, Merritt Milton Yancey, is entitled to inherit under the said will and codicil and likewise entitled to be listed as one of the sons of Carlisle Ellis and as a grandson of Charles D. Ellis as mentioned in the last will and testament of Kate G. Ellis, deceased. That the rights of said minor in and to the said estate have not been adjudicated or determined. That ''Merritt Milton Yancey, the grandson of Charles D. Ellis, was living at the time of the death of Kate G. Ellis, deceased, and that he is still alive and that Kate G. Ellis knew of the relationship of Merritt Milton Yancey to Carlisle Ellis and Charles D. Ellis at the time she executed her last will and testament and codicils thereto * * * that the said Kate G. Ellis had full knowledge at the time of making her will and codicils thereto that the said Merritt Milton Yancey was the illegitimate son of Carlisle Ellis.'' Following this is the prayer.

The will bears date of September 21, 1933; the first codicil, December 19, 1933; and second codicil, June 18, 1934, more than 16 years after the incident of the birth of this child.

To the foregoing application the executors filed a demurrer which alleged:

. ''That the facts stated in the application attacked do not entitle the applicant to the relief demanded (Code, section 11141 (5)) in that under the law of Iowa the word 'grandchildren' found in a will does not include illegitimates, unless an intent to include them can be deduced from the language of the will, without resort to extrinsic facts; that neither the Last Will and Testament and Two Codicils thereto of Kate G. Ellis, deceased, nor the application attacked show any intent on the part of the testatrix, Kate G. Ellis, to include Merritt Milton Yancey within the term 'grandchildren of the late Charles D. Ellis' as used in Paragraph First of the First Codicil to her Last Will and Testament; that it therefore appears on the face of the application that neither the applicant nor Merritt Milton Yancey have any share in the residuary estate of Kate G. Ellis, deceased, under her Last Will and Testament and Two Codicils thereto or any right to the relief demanded.''

Carlisle Ellis, the putative father, asked and was given leave to intervene, and, on the 10th day of December, 1937, filed his

petition of intervention setting forth that he is one of the residuary legatees having a direct interest in the matter in litigation, inasmuch as his interest would be diminished if the court should hold that Merritt Milton Yancey were entitled to participate, as one of the grandchildren of Charles D. Ellis, in the distribution of the residuary estate. He adopts the demurrer of the executors and joins them in praying that the application be dismissed for the reasons stated in the demurrer. This demurrer was overruled. Executors and intervener elected to stand on the demurrer. Judgment was entered for applicant as per sections 11147, 11148 of the 1935 Code. Executors and intervener have severally appealed.

In addition to the matters set out in the application, the entire will and two codicils are included in the abstract as being part of the record of which the trial court took judicial notice, and properly and rightfully considered in arriving at the intent of the testatrix, and this court has likewise taken notice of said will and codicils and examined and considered the same for the purpose of gathering the intent of the testatrix. Carpenter v. Lothringer, 224 Iowa 439, 275 N. W. 98; In re Huston's Estate, 224 Iowa 420, 275 N. W. 149. See, also, Parkes v. Burkhart, 101 Washington 659, 172 Pac. 908.

The will bears all the evidence of having been prepared by a careful lawyer. It is quite lengthy and disposes of a very large amount of property by specific devises and bequests, including numerous trusts, in all of which the names and residences of the donees, the objects and purposes of the trusts, the amounts of the gifts, and the duties of the trustees of the several trusts created are set forth in plain, unambiguous language. Each and every one of the six children of Charles D. Ellis and his nine grandchildren is remembered by the testatrix, and is given a specific legacy. In each of these bequests the name and residence of the legatee, and the amount of the legacy are set forth; in most instances, not only the name, but the relationship is given. Especially is this true with reference to the grandchildren of Charles D. Ellis.

Among the six children of Charles D. Ellis are Ida Ellis Dana, Prudence Ellis Kinsley, Carlisle Ellis, and Melvin W. Ellis, all of whom had children. Each of these is specifically named and remembered with a specific bequest. We set out

1294

that portion of the will referring to the grandchildren of Charles D. Ellis:

"(10) To Ellis H. Dana, Malcolm B. Dana, and Mary Dana, children of Ida Ellis Dana, of Charles City, Iowa, the sum of One Thousand Dollars ($1,000.00) each;

"(11) To Charles Jennings Ellis, son of Carlisle Ellis, of Charles City, Iowa, the sum of One Thousand Dollars ($1,000.00);

"(12) To Raymond W. Ellis and Harlan M. Ellis, sons of Melvin W. Ellis, of Charles City, Iowa, the sum of One Thousand Dollars ($1,000.00) each;

"(13) To Colony Kinsley, Penelope Kinsley, and Stephany Kinsley, daughters of Prudence Ellis Kinsley, the sum of One Thousand Dollars ($1,000.00) each;"

This is significant in that not one of the children or grandchildren of Charles D. Ellis is overlooked. Each is remembered with a personal bequest. Yet nowhere in the will or codicils is there any mention of this illegitimate son of Carlisle Ellis. Neither is there any language in the will and codicils which in any way tends to modify, explain, or enlarge the meaning or intendment of the plain words, "children and grandchildren of the late Charles D. Ellis." Not one word appears anywhere from which an implication may possibly be drawn that the testatrix, by the use of the words, "children and grandchildren", intended other than the plain, ordinary, legal meaning that the words impart. The circumstances alleged reveal that the child never bore the name Ellis. His adopted parents took him at the age of six months into their home where he has ever since resided and been known and called by their name. The record does not disclose that either his putative father, Carlisle Ellis, or the alleged grandfather, Charles D. Ellis, ever recognized this child in any way or manner as in any way related to them.

For the purpose of passing on the demurrer all well-pleaded facts are admitted as true with the same force and effect as if established by proof in open court at the time that the demurrer was passed upon. It is therefore admitted that Merritt Milton Yancey is the illegitimate son of Carlisle Ellis, of which fact the testatrix was fully cognizant at the time she executed her will and codicils, and at the time of her death.

With this fact situation, we are called upon to determine the meaning of the phrase, "children and grandchildren of the late Charles D. Ellis living at the time of my decease." The case has been very ably presented by experienced and learned counsel, the executors and the intervener presenting one theory, namely, that the word "grandchildren" found in a will does not include illegitimates unless an intent to include them can be deduced from the language of the will without resort to extrinsic facts; on the other hand, the appellee, with equal confidence, asserts that under accepted judicial construction, the word "grandchildren" found in a will does include illegitimates, unless an intent to exclude them can be deduced from the language of the will. Both of these theories cannot be right. Opposing counsel also differ just as radically concerning the admissibility of extrinsic proof to show the intention of the testatrix. Appellee contends that evidence may be introduced to show the condition under which the will was executed to arrive at the intention of the testatrix, while appellants contend that extrinsic proof may not be introduced where there are legitimate grandchildren in existence. After careful consideration of the many authorities cited, we are firmly convinced that the overwhelming weight of authority is on the side of the appellants' contention as to both of these propositions.

The judgment entry does not state upon what theory the demurrer was overruled. But three possible theories are advanced by appellee: (1) That the word "grandchildren" includes illegitimates; (2) that the term is ambiguous and extrinsic evidence is admissible to show the meaning intended; (3) that from the language of the will it is apparent that the testatrix intended by the use of such word to include illegitimates. The question we have to determine is whether there is in the record basis for any one of these possible theories. If the first can be sustained we need look no further.

Under the general subject, Bastards, 7 Am. Jur., page 715, paragraph 141, under the title "Gifts to 'Children'", it is stated:

"According to the weight of authority the word 'children' in deeds, wills, and other conveyances means legitimate children, unless the context is such as to require a different construction, or the surrounding circumstances are such as to make the word

import other than legitimate. If there is nothing else, the circumstances that the person whose children are referred to had illegitimate children will not entitle those illegitimate children to take. The rule is the same in the case where a woman is the designated parent as it is in the case of a man.

"There are two classes of cases in which the prima facie interpretation of the word 'children' has been departed from: (1) Where it is impossible from the circumstances of the parties that any legitimate children would take under the class, and (2) where there is, upon the face of the will itself and upon a just and proper construction and interpretation of the words used in it, an expression of the intention of the testator to use the term 'children' not merely according to its prima facie meaning of legitimate children, but according to a meaning which will apply to and include illegitimate children."

In an extended note in 94 A. L. R., page 116, the principle is stated as follows:

"Where there are legitimate children or persons of the other relationship designated in a will, extrinsic evidence is generally held not to be admissible to show an intention of the testator to refer to or include illegitimate children or other persons in a devise or bequest to the 'children', 'grandchildren', or the like, of the testator or of some named person."

Under this general proposition are cited cases from Kentucky, New Jersey, New York, Pennsylvania, South Carolina, Tennessee, England and Canada. One of the well-considered cases is Marquette v. Marquette's Ex'rs, 190 Ky. 182, 227 S. W. 157, where the testator used the word "children" and wherein the court said [page 158]:

"(1) The question very sharply presented is, whether it is competent to show by extrinsic evidence that the testator meant by the expression 'my children' to include an illegitimate child, or whether it, standing alone, without anything appearing in the will to the contrary, will be conclusively presumed to embrace only legitimate children? In answering the question it is indispensably necessary to remember that the cardinal rule for the interpretation of wills, everywhere recognized, is to ascertain and administer the intention of the testator as gathered from the entire will, or, as has been sometimes ex-

pressed, from its 'four corners'. Shields, Executor, v. Shields, 185 Ky. 249, 214 S. W. 907; Radford v. Fidelity & Columbia Trust Co., 185 Ky. 453, 215 S. W. 285; Hughes v. Cleveland Jewish Orphanage Asylum, 184 Ky. 461, 212 S. W. 428; Sauer v. Taylor's Executor, 184 Ky. 609, 212 S. W. 583; Greenwell v. Whitehead, 184 Ky. 74, 211 S. W. 411; Phelps v. Stoner's Adm'r., 184 Ky. 466, 212 S. W. 423; White v. White, 150 Ky. 283, 150 S. W. 388; Eichhorn v. Morat, 175 Ky. 80, 193 S. W. 1013; Wickersham v. Wickersham, 174 Ky. 604, 192 S. W. 688; Fowler v. Mercer's Executor, 170 Ky. 353, 185 S. W. 1117; and Prather v. Watson's Executor, 187 Ky. 709, 220 S. W. 532. But the intention of the testator which the court must ascertain from the will and administer is that which is expressed by what he did say, and not what he may have mentally entertained and intended to say, but did not. Shields, Wickersham, Fowler, Mercer, Eichhorn, and Prather Cases, supra, and 40 Cyc. 1386, 1387. In other words, the intention which the court seeks is the one which is manifested by the language which the testator employed in drafting his will, and in arriving at the meaning of his language the usual, primary, and commonly understood signification of the words employed will be given to them, unless some contrary signification, either expressly or by necessary implication, appears from the whole will. Compton v. Moore, 167 Ky. 657, 181 S. W. 360; Dickson v. Dickson, 180 Ky. 423, 202 S. W. 891, L. R. A. 1918F, 765, and 40 Cyc. 1396. * * *

"(2) What might be termed a secondary or subsidiary rule for the interpretation of wills is the one which permits courts to place themselves, by extraneous testimony, in the position and surrounding circumstances of the testator at the time he executed his will, but this rule applies only when there appears from the language of the will itself some uncertainty, ambiguity, or repugnancy which it is necessary to resolve and settle in order to ascertain what the testator meant. It is never resorted to when the language is plain and unambiguous, however harsh, capricious, or unreasonable the consequences might be. * * *

"(3) In the light of these thoroughly settled rules, whom did the testator in this case mean to include by the expression 'My children' as used in the residuary clause of his will? The primary, usual, ordinary, and legal signification of the word 'children' as used in a will is 'legitimate children' and it will

1298

not include illegitimate children 'unless the testator's intention to include them is clear, either by express designation or necessary implication.' 40 Cyc. 1451; 11 Corpus Juris, 762; Heater v. Van Auken, 14 N. J. Eq. 159; Tuttle v. Woolworth, 74 N. J. Eq. 310, 77 Atl. 684; note in 47 L. R. A. (N. S.) 534, and cases referred to; Ferguson v. Mason, 2 Sneed (Tenn.) 618; Appel v. Byers, 98 Pa. 479; note in Ann. Cas. 1915B, p. 51, and cases referred to; Harrell v. Hagan, 147 N. C. 111, 60 S. E. 909, 125 Am. St. Rep. 539; Sullivan v. Parker, 113 N. C. 301, 18 S. E. 347; Kemper v. Fort, 219 Pa. 85, 67 Atl. 991, 13 L. R. A. (N. S.) 820, 123 Am. St. Rep. 623, 12 Ann. Cas. 1022; Brisbin v. Huntington, 128 Iowa, 166, 103 N. W. 144, 5 Ann. Cas. 931; In re Truman, 27 R. I. 209, 61 Atl. 598, and Elliott v. Elliott, 117 Ind. 380, 20 N. E. 264, 10 Am. St. Rep. 54. * * *

"(4,5,) In the instant case there is no ambiguity, repugnancy, or uncertainty in the language of the testator. He uses the words 'my children' without employing any other expression in the entire will to indicate that he meant to include any other persons than those primarily included within the usual and ordinarily accepted meaning of the term, which, as we have seen, are legitimate children. It is true that, if there were no persons to whom the term would apply in its usual and ordinary meaning (legitimate children), it would be competent to show that the testator meant illegitimate children, if there were any; but, so long as there are individuals to whom the term can apply in its ordinary meaning, it will be conclusively presumed that only those persons are referred to, unless there is an implication to the contrary found somewhere in the will. To hold otherwise, would open wide the door for extraneous proof, not only to enlarge a plain and usually understood term with reference to the designation of beneficiaries, but likewise enlarge equally plain and well-understood terms designating the subject matter of the devise. And thus the certainty of wills in these respects, as well as the intention of the testator with reference thereto, would be disturbed, frustrated, and in many cases perhaps entirely thwarted. Besides, such a rule as contended for in this case would inevitably result in much fraud, to say nothing of possible perjury. The established rules supra have been duly weighed and tried and have been found to effectuate justice much more than could be done were they aban-

doned, although in some occasional cases (as is contended here) their application might produce harsh results."

We are strongly impressed with the sound logic of the foregoing opinion.

It will be noticed that among the list of cases cited in the above quotation is one from our own court. Brisbin v. Huntington, 128 Iowa 166, 103 N. W. 144, 5 Ann. Cas. 931, wherein the eminent jurist, Justice Ladd, undertook an analysis of the theories advanced bearing on the question of the right of illegitimate children to share in the distribution of property under a class designation as "children," "grandchildren," "issue," etc., and after reciting the facts, the opinion, as a basis for the legal discussion, states [page 174 of 128 Iowa, page 147 of 103 N. W.] :

"The decisions are unanimous that, in the absence of statutory provisions modifying the common law with respect to illegitimate children, the words, 'issue,' 'child,' or 'children,' found in a will or statute, whether qualified by the word 'lawful' or not, are to be construed as only those who are legitimate, and, if others are intended, this must be deduced from the language employed, without resort to extrinsic facts. Collins v. Hoxie, 9 Paige, [N. Y.] Ch. 81; Flora v. Anderson (C. C.) 67 Fed. 182; Gates v. Seibert, 157 Mo. 254, 57 S. W. 1065, 80 Am. St. Rep. 625; McDonald v. Ry. Co., 144 Ind. 459, 43 N. E. 447, 32 L. R. A. 309, 55 Am. St. Rep. 185; Heater v. Van Auken, 14 N. J. Eq. 159. This is on the ground that at the common law a bastard child had no inheritable blood, was kin to no one, could have no ancestor, nor be an heir, and could have no heirs save those of his own body. But this rule has been greatly modified by the enactment of statutes ameliorating his condition, and in different degrees conferring the rights of legitimate children. The bastard was *nullius filius* mainly in the matter of inheritance. In many other respects his status was the same as others. He could not marry within the levitical degrees, and was held to be within the act requiring the consent thereto of parent or guardian. His settlement was that of his mother. King v. Inhabitants of Hoduet, 1 Term R. 98. *The statutes of this State do not purport to legitimate the offspring of parents born out of wedlock.* Section 3384 of the Code provides that 'illegitimate children inherit from their mother and she from them'; and section 3385, that 'they shall inherit from the father when

the paternity is proven during his life, or they have been recognized by him as his children; but such recognition must have been general and notorious or else in writing. Under such circumstances, if the recognition has been mutual, the father may inherit from his illegitimate children'. These sections have been liberally construed, and in several decisions a natural child, when duly recognized by the father, held, *in the matter of inheritance,* as said in State v. Hastings, 74 Iowa 574, 38 N. W. 421, to 'stand in the same relation to him as though born in lawful wedlock.' Milburn v. Milburn, 60 Iowa 411, 14 N. W. 204; McGuire v. Brown, 41 Iowa 650; Johnson v. Bodine, 108 Iowa 594, 79 N. W. 348; Alston v. Alston, 114 Iowa 29, 86 N. W. 55; Goulding v. Phillips, 124 Iowa 496, 100 N. W. 516.

"But these are *statutes of descent only,* and do not undertake *to change* the *status of the bastard.* Van Horn v. Van Horn, 107 Iowa 247, 77 N. W. 846, 45 L. R. A. 93. He is illegitimate after recognition, precisely as before, and inherits as such, and not because he has become legitimate." (Italics ours.)

While the term made use of by the testator in the Brisbin case was "lawful issue", the court in the opinion finds that it was used in the limited sense of "children", the same as if the term were "lawful children"; that is to say, a class of persons which the law recognizes as coming within the class designation. In the absence of statute designating who are included within the class designation, the common law rules above quoted will prevail. Justice Ladd takes note of our statutory provisions now embodied in sections 12030, 12031 of the 1935 Code of Iowa and points out that these are statutes relating to descent only, and also to the fact that these statutes do not legitimate offspring born out of wedlock, and that only by the subsequent marriage of the parents can an illegitimate child ever become legitimate in this state. The case is made to turn on this want of legitimization. Note this from the opinion:

"Here is the very difficulty with the appellees' case. It lacks the element' essential to constitute * * * legitimization. They may *inherit* if duly recognized, but not as legitimate children." The opinion on page 178 of 128 Iowa, page 149 of 103 N. W. refers to a Georgia case, Hicks v. Smith, 94 Ga. 809, 22 S. E. 153, where the child was legitimated by order of court based on a statute enacted long afterward "declaring said child

to be legitimate." And Ladd says: "The decision seems to have been somewhat influenced by the rule that statutes in derogation of the common law are to be strictly construed, but, in any event indicates *the necessity of complete legitimation* to warrant the inclusion of the bastard in the words 'issue,' 'child,' 'children,' as employed in wills or deeds or statutes." (Italics ours.)

The case seems decisive of the present controversy. Appellee attempts to avoid it by saying that that part of the opinion above quoted and the discussion is in the nature of mere dictum. We do not so consider it. We think it squarely holds, and commits us, to the general rule followed in practically every state in the union except Connecticut, that the word "children," or "grandchildren" used in a will to describe a class includes only legitimates unless from the language of the will a contrary intent appears. Appellee also contends that, in the more recent cases, McKellar v. Harkins, 183 Iowa 1030, 166 N. W. 1061, and Hastings v. Rathbone, 194 Iowa 177, 188 N. W. 960, 23 A. L. R. 392, by judicial construction we have in effect overruled the case of Brisbin v. Huntington, 128 Iowa 166, 103 N. W. 144, 5 Ann. Cas. 931. As we read these cases they are not in conflict.

In the McKellar case reference is made to the Brisbin case in these words [page 1045 of 183 Iowa, page 1066 of 166 N. W.]: "It is urged, also, that the statute which confers the right of inheritance upon the illegitimate does not change its status as an illegitimate. This may be conceded. It was so held in Brisbin v. Huntington, 128 Iowa [166], 175, 103 N. W. 144, 5 Ann. Cas. 931. But this does not reduce the effect of the statute which confers upon the illegitimate the right of inheritance. Though illegitimate, her disabilities as to the right of inheritance are lifted by the statute. Her paternity being proven with that certainty required by the statute, her biological blood line becomes endowed with the right of inheritance."

Likewise, in the Hastings case, reference is made to the Brisbin case as follows [page 184 of Iowa 194, page 963 of 188 N. W.] : "In Brisbin v. Huntington, 128 Iowa 166, 103 N. W. 144, 5 Ann. Cas. 931, we recognized that the rule, in the absence of statutory provisions modifying the common law with respect to illegitimate children, the word 'child' was to be construed as applying only to those who are legitimate. We said: 'He is

illegitimate after recognition, precisely as before, and inherits as such, and not because he has become legitimate.' ''

No further mention is made of the Brisbin case and no thought is expressed which indicates the court was departing from the rule announced in said case. In both of these latter cases it was the right of an illegitimate to *inherit* that was under consideration.

In the Hastings case the court was considering the word "child" as used in section 11848 of the Code, which prohibits one from willing to certain corporations more than one-fourth of his estate where he has a "spouse," "child," etc., and the court said [page 186 of 194 Iowa, page 960 of 188 N. W.] : "The 'child' so referred to evidently and obviously means a child who would be entitled to *inherit* if the decedent had died *intestate*." (Italics ours.) There is some language by way of discussion which, if applied generally to all wills, might be said to hold that there can be no distinction between the meaning of the word "child" when used in relation to intestates and testates, but this dictum or argumentum and this language must be read and understood in the light of the particular matter under discussion in that case. Counsel for appellee also attempts to weaken the general rule relied upon by the appellants by pointing out that some of the cases cited are from the deep South. There is no merit in this. The general rule is adhered to by states throughout the nation. A case quite similar to the instant case, except the word used was "nephews" instead of "grandchildren", is the case of Lyon v. Lyon, 88 Me. 395, 34 Atl. 180, wherein the court says [page 183] :

"A testator is presumed to have used words in their ordinary meaning, unless such a construction would conflict with his manifest intention. Osgood v. Lovering, 33 Me. 464; Richardson v. Martin, 55 N. H. 45; Bolton v. Bolton, 73 Me. 299, 308. And where legacies or devises are given to a 'child' or 'children' of some person named, or to 'nephews,' these words mean, prima facie, legitimate children or nephews. Bolton v. Bolton, supra; Kent v. Barker, 2 Gray [Mass.] 535, 536. There is no word or phrase in that clause of the will under which the plaintiff claims, indicating that the testatrix used the word 'nephews' in any other than its ordinary and legal signification. Nor does the case disclose any facts from which we might

properly draw any such inference. The plaintiff is not specifically mentioned, nor is there any designating identification by which he can be considered as the object of her bounty under that clause wherein the testatrix bequeaths the sum of $2,000.00 to each of her nephews who may be living at the time of her decease.''

As further bearing on the question of extrinsic proof, see In re Lester's Estate, 115 Iowa 1, 87 N. W. 654, wherein an attempt was made to introduce oral testimony for the purpose of showing the intention with which the testator used the term ''heir at law'' in his will. Appellant, in that case, contending that the term ''heir'' is of uncertain meaning and may be explained by parol evidence of contemporaneous declarations of testator as to the persons who he intended to designate. This court said:

''The lower court rightly rejected this evidence. While it may be true that the word 'heir' is subject to explanation or qualification, the explaining and qualifying language must be found in the instrument itself. The term 'heirs at law,' not explained or qualified by other language in the will, has a perfectly definite meaning, which cannot be changed by proof outside of the will itself. No authorities need be cited in support of a proposition which is so well established.''

In a matter of such grave importance which concerns public policy touching a matter so vitally connected with the sense of decency and morality of the people as a whole, courts should hesitate to announce a rule upon which the law-making body has not clearly spoken. While the court may in a proper case make pronouncement of what it conceives to be a sound public policy in keeping with the genius and spirit of our laws and institutions, generally this is a matter, primarily, for the legislative branch of the government and up to the present time this branch of our government has not seen fit to incorporate into any law the theory upon which the appellee's case and the lower court's decision is founded. As bearing on the general policy of the legislature of this state, we might call attention to the statute relating to the effect of after-born children upon previously executed wills. Beginning with the Code of 1851 we had a statute in this state which provided that, ''Posthumous

children unprovided for by the father's will shall inherit the same interest as though no will had been made.'' Section 1284, Code of 1851. Likewise, as early as 1868, in the case of McCullum v. McKenzie, 26 Iowa 510, this court by judicial construction held that the birth of a child after the execution of a will and prior to the death of the testator father worked an implied revocation of his will. And in 1882, in the case of Milburn v. Milburn, 60 Iowa 411, 14 N. W. 204, this rule was applied to an illegitimate child which had been recognized by the father during his lifetime. Later, in the face of this judge-made law contained in the Milburn case, we find the legislature enacting a law providing that ''The subsequent birth of a legitimate child to the testator before his death, will operate as a revocation.'' Section 3276, Code of 1897. The statute relating to posthumous children, section 3279, still remained the same, the statute simply reading ''posthumous children,'' etc. In 1904, the 30th G. A. (Chap. 120) changed the law and incorporated the provision relating to children born after the will was executed and before the testator's death and the provision relating to posthumous children in one section, now found in section 11858 of the 1935 Code of Iowa, which states:

''Whenever a testator shall have a *legitimate* child born after the making of a last will, either in the lifetime or after the death of such testator,'' etc. (Italics ours.) Here we see a plain declaration on the part of the legislative branch of our government, indicating a public policy with reference to legitimate and illegitimate children as their birth affects a previously executed will. Especially is this significant after this court, in the Milburn case, had placed them on an equal basis where the illegitimate had been duly recognized by the father.

In considering this question, we should keep in mind that the intention of the testator is of primary importance at all times in the consideration of wills, and where words such as ''child,'' ''children,'' or ''grandchildren'' having definite legal meanings are made use of by the testator and there is nothing in the instrument itself to indicate such words were used in any other or different sense, the court should not permit such intention to be thwarted. It is the deceased person speaking through his or her will. Outsiders, aggrieved relatives, nor the courts have any business in substituting their will for that of the testator. The

rule is not based alone on common law fiction but has underlying it a sound public policy which enables a testator to make a devise to a class of persons by referring to them by a general term, such as, "children" or "grandchildren," "nephews" or "nieces," "sons" or "daughters," either of the testator, or of some third person, as in the instant case, without any insinuation of possibility of spurious offspring.

Out of a perfectly natural sense of pride and decency a matter of this kind is kept as far as possible behind the closed door of the family closet, as one of the unmentionable fruits upon the family tree, concerning which the least publicity possible is the best policy for all concerned. We are not inclined to promulgate a rule which would require the use of the insinuative word "legitimate" as a prefix to all class devises and bequests. The only language in the will in the instant case which tends to throw any light upon the intent of the testatrix is that wherein she named the sons and daughters of Charles D. Ellis and the grandchildren of the said Charles D. Ellis and remembered each and all of them with specific bequests, which might indicate she had in mind the persons considered by her as the objects of her bounty; the illegitimate child in question is not included in the list, although every legitimate grandchild is so included. The fact that she knew of this family scandal and did not make it a matter of public record by making some reference thereto in her will in order to obviate the inclusion of this natural offspring in the general term "grandchildren" should not be construed as an intention on her part to include such person in her will; especially in view of the fact that more than 16 years had elapsed since the incident of this child's birth and the making of her will, and since the child from infancy had been taken into the home of the Yancey's and was called by their name and referred to as their child, and had never become one of the Ellis family circle.

We conclude that there is nothing in this will or the application of the appellee which justified the trial court in holding that the use of the word "grandchildren" included illegitimates or in holding that there was a latent ambiguity which would entitle the applicant to introduce extrinsic proof, or in holding that there was any language in the will indicating that the testa-

trix intended by the use of the word "grandchildren" to include the illegitimate child in question.

Therefore, the demurrer should have been sustained and the case accordingly reversed.